**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JO S. GLENN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 12-CV-18-GKF-PJC |
| | ) |
| CITY OF TULSA, an Oklahoma | ) |
| municipal corporation, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment [Dkt. ##32, 36] filed by defendant City of Tulsa ("City"). The City seeks summary judgment on plaintiff Jo S. Glenn's claim of age discrimination in violation of the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*[1] Alternatively, it seeks summary judgment on plaintiff's claims for compensatory, punitive and liquidated damages.

### I. Material Facts

The City's Legal Department consists of four divisions: Criminal, contracts, real property and litigation. [Dkt. #32-1, Jean Ann Hudson Dep., 90:17-21]. At all times relevant to this dispute, David Pauling served as Interim City attorney and Jean Ann Hudson ("Hudson")

---

[1] In her First Amended Complaint, plaintiff also asserted a claim for sex discrimination in violation of a City policy prohibiting discrimination based on employees' or applicants' sexual preference. [Dkt. #15 at 6-7]. On July 26, 2012, the court granted the City of Tulsa's Motion to Dismiss the sex discrimination claim. [Dkt. #22]. *See Glenn v. City of Tulsa,* 2012 WL 3061483 (N.D. Okla. 2012).

served as Deputy City Attorney.  [Dkt. #32, Defendant's Statement of Fact ¶2; Dkt. #38, Plaintiff's Response to Statement of Fact ¶2].

Plaintiff Jo S. Glenn ("Glenn") is 61 years old.  She graduated from The University of Tulsa College of Law in 1976.[2]  Glenn was hired as an Assistant City Attorney I by the City in early January 2006.  In 2009, when the City of Tulsa began experiencing financial difficulties, it eliminated one of the two Attorney I positions within the City of Tulsa Legal Department. Glenn, who had less seniority than the other Attorney I, was laid off in late October, 2009.  [Dkt. #15, First Amended Complaint, ¶¶5-6; Dkt. #16, Answer, ¶¶5-6; Dkt. #38-3, Glenn Dep, 15:20-23].

According to the Tulsa City Charter and Personnel Policies, Glenn could exercise her right to be given priority for reemployment in the event a similar position became open within the year following her layoff.  If a position became open during the open year recall period, the employee would not have to reapply, nor would she have to go through the selection process. [Dkt. #38-1, Hudson Dep., 17:14-18:4]. Glenn requested that she be placed on the priority for reemployment list.  [Dkt. #15, First Amended Complaint, ¶9; Dkt. #16, Answer, ¶9].  At the time Glenn was laid off, Hudson was aware that Glenn's recall rights would expire on or about October 30, 2010.  [Dkt. #38-1, Hudson Dep., 18:5-25].

On or about July 1, 2010, the only other Attorney I position within the City Legal Department was vacated, and Hudson knew it was funded and vacant before October 30, 2010— the date Glenn's recall rights expired.  [Dkt. #32, Ex. 1, Hudson Dep., 19:8-20:24, Dkt. #38, Ex. A, Hudson Dep., 21:1-18].    The City did not call Glenn and bring her back to work before that date.  [Dkt. #38, Plaintiff's Statement of Additional Material Fact #32; Dkt. #42, Defendant's Response to Statement of Additional Fact 32]. Hudson testified the position was not filled before

---

[2] Glenn testified she had some 30 years of experience as a litigation attorney.  [Dkt. #38-3, Glenn Dep., 180:19-23].

October 30, 2010 because of timing and budget issues. [Dkt. #32, Ex. 1, Hudson Dep., 22:1-3]. Specifically, Hudson testified:

> When you do the budget, you have one account that is for all salaries. And within that, salaries includes the benefits. We had a number of other people that were also leaving, some people that had made noises of leaving, some people that were in a disciplinary progression system that could result in leaving.
>
> We potentially had a number of people who could leave and cash out their benefits. So we were very cautious about what money we did have. And we were still trying to get a feel for what the council was going to give us, because we were getting special permission, money that we did not have in our budget that the council was giving us more money for to hire two new positions.
>
> And the timing issue was I had a whole bunch of vacancies. And I was working to fill the most critical ones first. So I simply didn't have enough time to focus on that position at that time.

[*Id.,* 22:6-22].

Glenn testified she believes the attorney position was posted in December 2010. [Dkt. #32, Ex. 2, Glenn Dep., 117:9-16]. Hudson testified she had funds to fill the position in early 2011, after the City Council gave the Legal Department two additional positions for municipal court. [Dkt. #32, Ex. 1, Hudson Dep., 19:20-20:3]. Hudson had the authority to fill the two positions. [*Id.,* Hudson Dep., 91:11-14; Ex. 3, Def.'s Ans. to Interrog. No. 5]. Hudson testified that, at the time, "[o]ur stated mission from the administration had been to improve the credentials and the reputation of the attorneys in the legal department." [Dkt. #32, Ex. 1, Hudson Dep., 71:8-12]. Hudson stated she was also "looking for promotability in these candidates." [*Id.,* 58:21-23].

An Assistant City Attorney I need not have any previous legal work experience. [*Id.,* 9:13-25; 25:21-24 and Ex. 1 thereto; Dkt. #32, Ex. 2, Glenn Dep., 185:3-12]. The City received "a large number of impressive applicants" for the positions—many more than Hudson had

3

previously received for any legal position. [Dkt. #32, Ex. 1, Hudson Dep., 70:22-25;Dkt #32, Ex. 2, Glenn Dep., 159:5-12].

Applicants for Assistant City Attorney must first be "certified" by the City Human Resources Department. [Dkt. #32, Ex. 1, Hudson Dep., 7:10-25; Dkt. #32, Ex. 2, Glenn Dep., 161:3-8]. The certification process determines only whether applicants meet eligibility requirements for a particular position. [Dkt. #32, Ex. 2, Glenn Dep., 161:21-162:5; Dkt. #32, Ex. 2, Hudson Dep., 49:7-11 and Ex. 10 thereto]. At all times relevant to this action, it was the legal department's practice to use a multi-member panel to conduct interviews for certification purposes ("Certification Panel"). [Dkt. #32, Ex. 1, Hudson Dep., 7:10-14, 22-24].

In an effort to narrow the large pool of candidates, Hudson selected from among candidates based on "grades, published authors, writing samples, or something else in their background or experience that was impressive" to make the candidate deserving of consideration. [*Id.,* Hudson Dep., 52:4-9, 71:13-18 and Ex. 12 thereto at COT000189]. Hudson routed the narrowed applicant pool to both Pauling and Bob Garner, Criminal Division Manager, with instructions to select 10 applicants for consideration by the Certification Panel. Collectively, the three assembled a list of 10 names, including Glenn, to be interviewed by the Certification Panel. [Dkt. #32, Defendant's Statement of Fact ¶13; Dkt. #38, Plaintiff's Response to Statement of Fact ¶13].

Susan Nerren, a Human Resources analyst for the City, was automatically included on the Certification Panel because she was ultimately responsible for certifying applicants. [Dkt. #32, Defendant's Statement of Fact ¶14; Dkt. #38, Plaintiff's Response to Statement of Fact ¶14]. Hudson had authority to select the remaining members of the Certification Panel, and chose Tony Cellino, head of the municipal court department, and Beth Anne Wilkening, City

Attorney for the City of Broken Arrow. [Dkt. #32, Defendant's Statement of Fact ¶15; Dkt. #38, Plaintiff's Response to Statement of Fact ¶15].

At the conclusion of the certification interviews, five applicants, including Glenn, were certified as eligible for the position. [Dkt. #32, Defendant's Statement of Fact ¶16; Dkt. #38, Plaintiff's Response to Statement of Fact ¶16]. Glenn was ranked highest of the certified applicants, but that "ranking" was solely offered for informational purposes and was not binding upon the selection panel or Hudson. [Dkt. #32, Defendant's Statement of Fact ¶17; Dkt. #38, Plaintiff's Response to Statement of Fact ¶17].

Certified candidates were then interviewed by a four-member panel ("Selection Panel"). [Dkt. #32, Defendant's Statement of Fact ¶18; Dkt. #38, Plaintiff's Response to Statement of Fact ¶18]. Hudson was a member of the Selection Panel and had authority to select the remaining members of that panel; she chose Litigation Division Manager Gerry Bender, Garner and Pauling. [Dkt. #32, Defendant's Statement of Fact ¶19; Dkt. #38, Plaintiff's Response to Statement of Fact ¶19].

In preparation for interviews, Hudson reviewed the work history of the certified applicants. [Dkt. #32, Defendant's Statement of Fact ¶20; Dkt. #38, Plaintiff's Response to Statement of Fact ¶20].

Hudson reviewed Glenn's personnel file from her previous employment as an Assistant City Prosecutor. [Dkt. #32, Ex. 1, Hudson Dep., 81:9-10, 34:17-21, 53:1-18]. Included in the personnel file were three reports pertaining to Glenn. [Dkt. #32, Ex. 4, Hudson Affid., ¶ 4 and Ex. A thereto]. The first was a complaint from Tony Cellino, Court Administrator, Municipal Criminal Courts, to Deirdre Dexter, former City Attorney, dated July 31, 2007. [*Id,* Ex. A, COT000164]. Cellino stated another employee had reported "unprofessional" behavior by

5

Glenn. Specifically, he said Glenn made "loud" complaints to court personnel regarding a case assigned to her by a municipal judge (Judge Crawford), and told them she would not handle the case. [*Id.*] Cellino expressed concern that "Jo's negative attitude" might "infect my employees." [*Id.*]. The second was an Employee Counseling Record dated August 1, 2007, completed by Glenn's supervisor. [*Id.,* Ex. A, COT000165]. The document references Cellino's complaint and further states that Glenn had "participated in and repeated inappropriate gossip and comments regarding municipal court employees," behavior considered "unprofessional" and "divisive" by the supervisor. [*Id.*]. The third consists of emails between Cellino and Dexter concerning an issue between Glenn and a public defender. [*Id.,* Ex. A at COT000166]. Cellino stated therein: "I suggest we postpone our meeting, and let's see if they can work their differences out like professional adults." [*Id.*].[3]

---

[3] As previously noted, Cellino, who was on the Certification Panel for the two open attorney positions, ranked Glenn first among the candidates the panel interviewed. [Dkt. #38, Ex. H, Candidate Evaluation Worksheet]. Subsequently, Hudson emailed Cellino, thanking him for serving on the panel, but commenting:

> I was surprised, however, when advised that you consider your issues with Jo Glenn to be "water under the bridge," given the number of complaints about her, some of which are in her file and many of which are not. Please understand that in light of your statements it would be very difficult for you to complain about her in the future should she be hired for the current position. If I misunderstood your position, plese let me know.

[Dkt. #38-9, Ex. I]. Cellino responded in pertinent part:

> In the matter of Jo Glenn, I do believe you misunderstood my position. The issue took place in 2007 and was brought to Deirdre Dexter's attention. Deirdre Dexter and Bob Garner addressed and resolved the problem, and since that time my staff and I have enjoyed an excellent working relationship with all the employees in the City Prosecutor's Office; hence the statement "water under the bridge".
>
> If for any reason you fe[el] Jo Glenn is not an appropriate candidate, the remaining round of interviews will allow an opportunity to exclude her from reemployment, if you so desire. For my part I believe she is well qualified.
>
> In closing, please understand that I do not possess the ability to predict an individuals' future behavior. Therefore, if any employee within the City Prosecutor's Office commits an infraction that requires attention, I will not hesitate to bring the matter to the attention of the City Attorney.

[*Id.*]. Hudson then responded in pertinent part:

6

At the conclusion of all Selection Panel interviews, Hudson solicited input from the members of the panel. [Dkt. #32, Defendant's Statement of Fact ¶22; Dkt. #38, Plaintiff's Response to Statement of Fact ¶22]. Of the four panel members, only Bob Garner initially recommended that Glenn be hired. [*Id.*] Ultimately, however, he agreed that Sarah Davis and Kenna Whelpley should be hired for the positions. [Dkt. #32, Ex. 1, Hudson Dep., 93:22-25].

Hudson selected Davis and Whelpley for the two Assistant City Attorney I positions. [*Id.,* Hudson Dep., 10:3-11]. Both were under the age of 30. [Dkt. #38, Plaintiff's Statement of Additional Undisputed Fact ¶43; Dkt. #42, Defendant's Response to Plaintiff's Statement of Additional Undisputed Fact ¶43].

Hudson testified her decision to hire these applicants instead of Glenn was based on the following:

   a. *Glenn's relative education achievement*—Glenn's GPA was significantly lower than the GPAs of the applicants hired. [Dkt. #32, Defendant's Statement of Fact ¶24a; Dkt. #38, Plaintiff's Response to Statement of Fact ¶24a].

   b. *Promotability*—Hudson testified Glenn was "very clear in her interview that she had no desire to promote, this was the only job she wanted to do, and she wanted to do

---

As you know, these are entry level positions which allow a new, inexperienced attorney the opportunity for future advancement within the Legal Department. A candidate's experience, while it may be helpful in the short term, is not really relevant to a hiring decision because the position specifically states that no experience is expected or required. Of greater concern for these entry level positions is what we try to predict coming out of the interviews—whether the candidate would be able to work well with the myriad individuals and personalities that are involved in representing the City of Tulsa as a member of the prosecutor's office. As you know, the City prosecutors deal with other attorneys, court personnel, and unrepresented individuals on a daily basis. Given your previous complaints about Ms. Glenn, I wanted to ensure that, in fact, you had no reservations about the possibility she might be hired.

I appreciate your candor and, based on our comments, must assume that you have no reason to anticipate that Ms. Glenn would engage in similar behavior should she be hired for one of the two vacant positions. . . .

[*Id.*].

7

that job until she retired." [Dkt. #32, Ex. 1, Hudson Dep., 89:8-15; *See also* Dkt. #32, Defendant's Statement of Fact ¶24b; Dkt. #38, Plaintiff's Response to Statement of Fact ¶24b;].[4]

c. *Glenn's prior performance and behavior—*Hudson testified that during Glenn's previous employment with the City, Deirdre Dexter had voiced many complaints about Glenn, including that she was "rude, unprofessional, insubordinate." [Dkt. #32, Ex. 1, Hudson Dep., 35:1-11]. Hudson stated that "[s]taff meetings generated much of this," and "Jo was a big reason why staff meetings were discontinued for the entire attorney population." [*Id.,* 35:12-14]. Hudson said she observed such behavior by Glenn at staff meetings and stated that Glenn's "tone and manner and negative attitude were constant," that Glenn "spoke inappropriately," "vented," and "spoke on issues, that didn't necessarily warrant her input, in a fashion that was disrespectful to her coworkers." [*Id.,* 35:21-25].

Hudson testified that during the interview, Glenn told Hudson she had not made the Crawford complaint; and told the panel about judges she had made mad and "proceeded to name them all on her finger counting them off in a fashion that suggested to me that she was somewhat proud of having done so." [Dkt. #32, Ex. 1, Hudson Dep., 59:5-25]. Hudson said she thought this "was incredibly poor judgment in an interview." [*Id.,* 59:21-22]. Hudson also testified that during the interview, she was "trying to probe whether or not if [Glenn] returned to employment, she would continue with a negative, disruptive attitude," and "I needed her to assure what was going to be different if she were hired this time." [*Id.,* 56:25-57:4]. She stated that Glenn made

---

[4] Glenn's testimony on this issue was consistent with Hudson's. [Dkt. #32, Ex. 2, Glenn Dep., 31:11-16, 156:7-15, 172:14-16].

no statements at any point during the course of her selection interview "to the effect that she would not continue [that attitude] if she were rehired." [*Id.*, 88:16-25].

Glenn's version of the interview differs. She testified that during the interview, "Jean Ann basically told me that I was the most complained about attorney in the entire history of the department, that—and she went on and on about stuff." [Dkt. #38, Ex. 3, Glenn Dep., 171:2-5]. She said she told Hudson, "I don't know what you're talking about. I mean I know about one day, but I don't know what you're talking about," and Bob Garner said, "Neither do I." [*Id.*, 171:5-12]. Glenn stated, "I think Jean Ann was making a lot of it up. Or if she wasn't, she just didn't—it was never brought to my attention at the time. It's like going back and finding every little problem anyone ever had and deciding to bring it up on the same day and say now you're not qualified." [*Id.*, 171:13-19].

Glenn testified she believes she was not hired because the City was "after younger people." [Dkt. #32, Ex. 2, Glenn Dep., 8:7-10]. She stated, "I mean they hired two people whose age, if you combine them, still didn't reach mine." [*Id.*, 8:10-12]. She thinks the City was after younger people because "they can pay them less." [*Id.*, 8:14-16]. Further she testified: "I think that [age] was a factor. I'm not saying it was the only factor. I mean she obviously was trying to not hire me for any number of reasons, most of which I'll probably never know about," and one of the reasons was "[s]he didn't like me." [Dkt. #32, Ex. 2, Glenn Dep., 206:1-8].

Glenn also testified, "I'm sure there are personalities involved also," and "I was very well thought of within my office, probably not as well thought of in—with some of the hierarchy," including "mainly Jean Ann." [*Id.*, 8:12-13, 8:25-9:11]. She described an instance in which she believed she inadvertently offended Hudson by offering to assist her with trial work. [*Id.*, 129:20-130:8]. She stated, "[S]omehow, someway in sometime during the time that I was there I

9

ran afoul of Deirdre and Jean Ann." [*Id.,* 141:7-9]. She stated, "Part of the problem is that Jean Ann and Deirdre . . . never appreciated what the city prosecutor's office role was" and "they thought anybody can be a prosecutor but it takes a real lawyer to be in the civil division." [*Id.* 141:10-17]. She testified that during the interview, she told Hudson that "I would, you know be a good employee. And, you know, and if we had a personality dispute that, you know, I wouldn't even come to a staff meeting if she didn't—you know, if it's just between you and me that, you know, I will make sure I don't cross paths with you." [*Id.,* 179:15:21].

Additionally, Glenn testified she believed her sexual orientation was a factor in the City's decision not to hire her, stating: "[T]here were comments made over the years by different people that indicated that—and I don't remember specific comments. It's just kind of a feeling that some of the people that if you were—you know, it would have been better if everybody was straight." [*Id.,* 13:21-14:14].

## II. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997).

A party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact, but must support such assertions by citing to particular parts of the record, including depositions, documents, affidavits or other materials. Fed.R.Civ.P. 56(c)(1). An affidavit used to support or oppose a motion must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  Fed.R.Civ.P. 56(c)(4).  Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact.  *L & M Enterprises, Inc. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000).  [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

### III. Analysis

The ADEA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment *because of* such individual's age."  *Jones v. Oklahoma City Public Schools,* 617 F.3d 1273, 1276 (10th Cir. 2010) (citing 29 U.S.C. §623(a)(1)( emphasis in original).  In *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 180. (2009), the Supreme Court clarified the meaning of the phrase, "because of," as used in the ADEA.  The court held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action "because of" age is that age was the 'reason' that the employer decided to act."  *Id.* at   Thus, in order to establish a claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Id.*

> In the wake of *Gross,* the Tenth Circuit commented:
>
> The Tenth Circuit has long held that a plaintiff must prove but-for causation to hold an employer liable under the ADEA. Moreover, we have concluded that this causal standard does not require[] [plaintiffs] to show that age was the sole motivating factor in the employment decision. Instead, an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as age was the factor that made a difference. *Gross* does not hold otherwise.  Accordingly, *Gross* does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action.

*Jones,* 617 F.3d at 1277-78 (quotations and citations omitted).  The court in *Jones* concluded that *Gross* "has no logical effect on the application of *McDonnell Douglas* to age discrimination claims," and stated, "the burden of persuasion [n]ever shifts to the party defending an alleged mixed-motives discrimination claim brought under the ADEA. *McDonnell Douglas*...does not shift the burden of persuasion from the plaintiff to the defendant.  Rather it shifts only the burden of production.  Throughout the three-step process, the plaintiff...carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis."  *Id.*at 1278.

### 2. Application of *McDonnell Douglas* Burden Shifting Analysis

To prove a prima facie case of age discrimination, Glenn must show by a preponderance of the evidence that (1) she belongs to a protected class; (2) she applied and was qualified for a job for which the City was seeking applicants; (3) she was rejected despite her qualifications; and (4) the position was filled by other applicants.  *See Garrison v. Gambro,* 428 F.3d 933, 937 (10th Cir. 2005).   If Glenn can establish a *prima facie* case, the burden shifts to the City to produce a legitimate, nondiscriminatory reason for its action.  *See Garret v. Hewlett-Packard Co.,* 305 F.3d 1210, 1216 (10th Cir. 2001).

"Once the plaintiff has made out a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Pinkerton v. Colo. Dep't of Transp.,* 563 F.3d 1052, 1064 (10th Cir. 2009).  The employer's burden is one of production, not persuasion.  *Doubele v. Sprint/United Management Company,* 342 F.3d 1117, 1135 (10th Cir. 2003).

Once the employer has articulated a legitimate reason for the adverse employment action, plaintiff must demonstrate that the employer's asserted reasons are pretextual.  *Pinkerton*, 563 F.3d at1064.

12

### a. Prima Facie Case

Glenn was 59 years old at the time of the events giving rise to this action. She applied for and was qualified to fill the attorney positions at issue. She was not hired. Instead, two substantially younger applicants were chosen. The City concedes, for the purpose of summary judgment, that Glenn has established a *prima facie* case of age discrimination.

### b. Employer's Legitimate Non-Discriminatory Reason

The City has presented evidence Glenn was not hired based on her law school GPA, her resistance to promotion and Hudson's opinion that Glenn behaved unprofessionally during her prior employment with the City. The City has met its burden of establishing a legitimate, nondiscriminatory basis for its decision.

### c. Plaintiffs' Evidence of Pretext

Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations and citations omitted). It is not enough, however, that a factfinder could disagree with the employer's assessments of an employee' skills and abilities. *Exum v. U.S. Olympic Comm.,* 389 F.3d 1130, 1138 (10th Cir. 2004). Moreover, the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether the employer honestly believed those reasons and acted in good faith on those beliefs. *Id.* Consequently, in order to show pretext, the plaintiff must call into question the honesty or good faith of the employer. *Id.* at 1137.

Viewed in the light most favorable to Glenn, the evidence shows that Hudson disliked Glenn, did not want to hire her, delayed filling the Attorney I position until after Glenn's recall period had expired, and actively lobbied others against hiring her. Moreover, taking as true Glenn's version of the interview, Hudson—not Glenn—raised the issue of the previous incident(s) and hounded Glenn about her behavior.

Hudson's opinion of Glenn was perhaps not fair or correct. And her stated hiring criteria—GPA, promotability and professionalism—might not have been the wisest or best bases for the decision.

However, Glenn has presented no *evidence* age was a factor in the decision, much less the "but for" reason she was not hired. Her own opinion that the City or Hudson preferred younger applicants is not sufficient to prove age discrimination. *See Aramburu,* 112 F.3d at 1408 n. 7 (subjective belief of discrimination is not sufficient to preclude summary judgment). Nor does the City's hiring of younger applicants—in and of itself—establish intentional discrimination. *See Murphy v. Facet 58, Inc.,* 329 F.Supp.2d 1260, 1271 (D. Utah 2004) (the fact that someone younger was possibly hired to replace plaintiff does not demonstrate age discrimination). And Glenn's own testimony that she had a personality conflict with Hudson, that Hudson did not like her, and that her sexual orientation was a factor in the hiring decision undercuts her argument that her age was the "but for" factor in the decision. *See Roberts v. International Business Machines Corp.* ---F.Supp.2d ----, 2012 WL 4052515, *5 (N.D. Okla., 2012)* (ADEA plaintiff, in asserting *Burk* tort claims, "tacitly admit[ted] that [d]efendant had a mixed motive for [p]laintiff's termination").

Glenn has failed to carry her burden of presenting evidence that the City's stated legitimate business reason for the hiring decision is pretextual or that age was the "but for"

14

reason she was not hired. Therefore, the City is entitled to summary judgment on Glenn's ADEA claim.

## IV. Conclusion

For the foregoing reasons, the City's Motion for Summary Judgment [Dkt. #32] is granted. The City's Alternative Motion for Partial Summary Judgment [Dkt. #36] is moot.

ENTERED this 5th day of April, 2013.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT